[Cite as *In re P.T.*, 2020-Ohio-4900.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re P.T., A.T.

Court of Appeals No.   L-20-1092
                                        L-20-1093

Trial Court No.        JC 18266748

**<u>DECISION AND JUDGMENT</u>**

Decided:  October 14, 2020

* * * * *

Christopher S. Clark, for appellant, D.S.

Laurel A. Kendall, for appellant, A.T.

Jeremy G. Young, for appellee

* * * * *

**SINGER, J.**

{¶ 1} This is an appeal from the April 9, 2020 judgment of the Lucas County

Court of Common Pleas, Juvenile Division, terminating the parental rights of appellant,

A.T., the mother ("mother") of P.T. and A.T., and appellant, D.S., the father ("father") of

the children, and granting permanent custody of the children to appellee, Lucas County Children Services ("LCCS"). Mother and father have filed separate appeals, which have been consolidated. For the reasons that follow, we affirm the judgment.

{¶ 2} Father sets forth two assignments of error:

I. The trial court erred in finding by clear and convincing evidence that appellee made reasonable efforts to re-unify the children with appellant-father.

II. The trial court erred in finding by clear and convincing evidence that it is in the best interest of the children to terminate appellant-father's parental rights and to award permanent custody of the children to Lucas County Children Services ("LCCS").

{¶ 3} Mother sets forth two assignments of error:

I. The evidence supporting the trial court's finding that the minor child A.T. could not be returned to the parents was not clear and convincing when the child had only been removed approximately seven months before the final hearing.

II. The evidence supporting the trial court's finding that the minor child A.T. herein could not be returned to the parents was against the manifest weight of the evidence when the child had only been removed approximately seven months before the final hearing.

2.

## Background

{¶ 4} Mother and father are the parents of P.T., who was born in January 2018, and A.T., who was born in April 2019. Mother and father, who were in an on-again, off-again relationship, never married.

{¶ 5} In January 2018, LCCS became involved with the family when P.T. was born with marijuana in her system, and there were mental health concerns with mother.

{¶ 6} On January 22, 2018, LCCS filed a complaint in dependency and neglect and a motion for shelter care hearing. A hearing was held that day, and the magistrate issued a decision finding: mother has untreated mental health issues, domestic violence issues and no housing; both parents have criminal histories; and father admits to marijuana use and lives with his dad. The magistrate granted LCCS interim, temporary custody of P.T., and P.T. was placed in a foster home.

{¶ 7} On January 25, 2018, the court appointed a special advocate/guardian ad litem ("CASA/GAL") for P.T.

{¶ 8} On February 9, 2018, the original case plan was filed. Thereafter, numerous amended case plans were filed, and approved by the court.

{¶ 9} On March 1, 2018, father filed a motion for legal custody and to determine visitation and support.

{¶ 10} On March 7, 2018, a hearing was held, and on March 8, 2018, the magistrate issued a decision adjudicating P.T. dependent, and granting LCCS temporary custody. P.T. remained in the foster home.

3.

{¶ 11} On March 12, 2018, the judge filed a judgment entry in which she found, by clear and convincing evidence, that P.T. was dependent and it was in P.T.'s best interest to award LCCS temporary custody. LCCS's temporary custody of P.T. was extended several times.

{¶ 12} On October 24, 2018, father filed a motion for legal custody and to determine visitation and support. On November 16, 2018, mother filed a motion for legal custody.

{¶ 13} In April 2019, A.T. was born. LCCS filed a complaint in dependency, and was granted protective supervision over A.T., who lived at home with mother and father. A case plan and amended case plans were filed and approved by the court.

{¶ 14} On April 10, 2019, the court appointed the same GAL for A.T.

{¶ 15} On July 25, 2019, a joint motion to dismiss the motions for legal custody was filed; the motion was granted the same day.

{¶ 16} On August 12, 2019, LCCS filed a motion to change disposition and for temporary custody of A.T., and requested an emergency hearing. LCCS alleged mother reported to Melissa Coburn, the permanency worker for the family, that there were domestic violence incidents with the children present, and mother was scared of father. The magistrate issued an ex parte order that same day ordering A.T. into shelter case custody at once. A.T. was removed from the parents' care and placed in the same foster home with P.T.

4.

{¶ 17} On August 20, 2019, the judge issued a judgment entry. Custody and placement of A.T. was reviewed and approved.

{¶ 18} On November 15, 2019, father filed a motion for legal custody of A.T.

{¶ 19} On December 12, 2019, LCCS filed a motion for permanent custody of P.T., and on February 13, 2020, LCCS filed a motion for permanent custody of A.T.

{¶ 20} On February 19, 2020, the trial court consolidated P.T. and A.T.'s cases.

{¶ 21} On March 30, 2020, the CASA/GAL filed her report and recommendations. Also on that day, the hearing on the motions for permanent custody was held. Mother and father arrived together, approximately two hours late. The court announced its decision on March 31, 2020. On April 9, 2020, the court issued its judgment entry, granting permanent custody of the children to LCCS. Father appealed, then mother appealed.

## The Permanent Custody Hearing

{¶ 22} Mother and father testified at the March 30, 2020, hearing. LCCS called the caseworker and CASA/GAL. The relevant testimony is summarized below.

## Caseworker

{¶ 23} Emily Mauter testified to the following. She is an ongoing caseworker for LCCS, and started working with mother, father and P.T. in January 2018. The case was opened because P.T. tested positive for marijuana at birth and there were concerns regarding mother's mental health, and domestic violence, substance abuse and housing issues for mother and father.

5.

**{¶ 24}** Mother has been diagnosed with bipolar personality disorder and has been in multiple facilities for treatment. Mother has an older child, a son, who has a different dad. The son was adopted in 2019, and mother's parental rights were terminated.

**{¶ 25}** The case plan services for both mother and father included undergoing a dual diagnostic assessment ("DDA"), completing anger management, parenting and maintaining stable housing. Mother completed her DDA in January 2018, and was diagnosed with anxiety, depression and misuse disorder, mild. It was recommended that she undergo a psychiatric evaluation. Mother was prescribed medication. Mother completed dual recovery group in June 2018. It was also recommended that mother attend counseling twice a month, which she did until October 2018, at which point she missed ten sessions. There were concerns that mother's medication had changed and she was not sleeping well, but it turned out mother was pregnant, which she withheld. There were then concerns if mother was getting medical treatment. Mother did resume counseling, which continued through June 2019. Also in June 2019, mother completed the psychiatric evaluation, and she was diagnosed with major depressive disorder, recurrent, with anxious distress and other specified personality disorders. It was recommended that she complete a diagnostic assessment ("DA") for dialectical behavior therapy ("DBT") through Perrysburg Counseling or another counseling service. Mother completed the DA on October 8, 2019, but she did not follow through with DBT.

6.

{¶ 26} Father completed a DDA in March 2018, and was not recommended for mental health services. Mother and father completed anger management in April 2018, and parenting classes in May 2018.

{¶ 27} Regarding visits, the parents' visits with the children were appropriate. At first, mother and father visited consistently with P.T., with supervised visits starting in July 2018. In January 2019, overnight visits with P.T. were added, one night a week for four weeks. On February 13, 2019, P.T. was with mother and father, which was the first week P.T. was having two overnights with parents. Mother and father were told they could take P.T. to a medical appointment, because P.T. had a fever and was not feeling well. Mother emailed Mauter the next day to ask if they could make an appointment; a medical appointment was made, but parents did not take P.T. due to car trouble. On February 15, 2019, when P.T. was picked up by visitation transportation, father said P.T. had burns on her hand, he was not sure from what, and P.T. needed medical attention. The foster family took P.T. to the hospital where she was diagnosed with a first and second degree burn. There was an open investigation that was substantiated for neglect by the parents for not seeking medical attention for P.T. The cause of the burn was never determined. As of February 15, 2019, the parents' visits with P.T. were returned to LCCS.

{¶ 28} When A.T. was born in April 2019, mother and father were doing services and were doing well, so A.T. went home with protective supervision.

7.

{¶ 29} In August 2019, there were domestic violence concerns, and the children were present. Mauter learned, via mother's hospital records, about domestic violence incidents resulting in injuries to mother. At a staffing meeting on August 19, 2019, mother said domestic violence between her and father was going on for a long time. Based on the disclosure, LCCS removed A.T. from the home, and LCCS filed for custody. A.T. was placed in the same foster home as P.T. Level 2 visits at LCCS were arranged for the children with mother and father, separately. Mother denied to Mauter multiple times that there was domestic violence, then mother would confirm there was domestic violence. It was a challenge to tell when mother was truthful.

{¶ 30} In September 2019, mother admitted that she had a medical condition which caused her to faint or pass out five to eight times a day. In order to keep the children safe during visits, Level 1 visits were instituted. Mother stopped visiting the children from November 1, 2019 until February 3, 2020, and the reasons given by mother were: she was visiting a relative in New York; she had transportation issues; and she did not want to visit in Level 1, so until she was in Level 2, she would not visit the children. Mother was told in order to move to Level 2, she had to attend visits and keep Mauter updated on her medical diagnosis and treatment. Since November or December 2019, Mauter's contact with mother was difficult as mother did not see the point of seeing Mauter. LCCS suspended visitation with the children on March 17, 2020.

{¶ 31} Father stopped visiting with the children from November 4, 2019 until January 31, 2020, due to work. Mauter reached out to father, and he restarted visits. The

8.

last time Mauter saw father was February 28, 2020, when he was visiting with P.T., and had concerns about a bruise on her thigh, a scratch on her leg, and her hair was not greased properly. Mauter contacted the foster family who explained P.T. scraped her leg while jumping on a diaper box and she had a rash, which was darker and discolored. Father insisted the scrape was a dog scratch, and he got hostile. Mauter recalled there were other allegations made by the parents, and after LCCS investigated, the parents would continue to make allegations.

{¶ 32} In February 2020, there was a report of domestic violence made by mother that father had slapped her or assaulted her.

{¶ 33} As to mother's marijuana use, she tested positive on February 23, 2018, and was a no-show for a test on April 9, 2018. From April 12, 2018 to June 20, 2019, mother's drug screen was clean. When A.T. was born in April 2019, mother did not test positive for marijuana. In July 2019, mother tested positive for THC twice, and she told Mauter that she had a medical marijuana card and smoked marijuana. Mauter talked to mother about how she did drug treatment for marijuana and should not be testing positive for it. In November 2019, mother was a no-show for a test, and on March 9, 2020, mother tested positive for marijuana.

{¶ 34} Concerning father's marijuana use, his drug screens were clean from February 22, 2018 until December 4, 2018. Father did not test positive for marijuana in April 2019, when A.T. was born. He did test positive on June 20, 2019. In his latest drug test, on December 17, 2019, he was clean.

9.

{¶ 35} Regarding housing, mother and father lived together the majority of the case, starting in April 2018. At the time of trial, mother was living at the YWCA and father had housing, but had been served with an eviction notice.

{¶ 36} Mother did not complete domestic violence survivor services, although she said she completed domestic violence courses when she was with a prior boyfriend. Mother did not follow through with recommendations and treatment, and does not have stable housing. Mauter was still concerned about mother's mental health. Father has yet to complete batterer's intervention and there is an outstanding warrant because of the February 10, 2020 domestic violence charge.

{¶ 37} Mauter last spoke with mother on March 9, 2020, when mother said she wants to mend the relationship with the foster family. Mother said she never had any ill will, it was father who would go to war with other people. Mother was okay with the foster family adopting the children.

{¶ 38} P.T. has been in LCCS's temporary custody for pretty much her entire life, and LCCS took temporary custody of A.T. in August 2019. The children are in the same foster home, and there have never been any concerns with the foster family. The children are very happy, well taken care of and adored.

{¶ 39} Mauter believed it was in the children's best interest for LCCS to be awarded permanent custody, and she recommended that LCCS be awarded permanent custody so of the children can be adopted by the foster family. Although the parents have

10.

completed some services, there are still concerns for housing, substance abuse, mental health and domestic violence.

**Mother**

{¶ 40} Mother testified to the following. She arrived at court with father because he paid for an Uber to pick her up, then pick him up. Mother thinks LCCS first got involved in this case when the woman who has her son called and made a referral because that woman wanted P.T. and did not approve of father. Mother stated the caseworker said the main concern was mother's mental health, as she has been diagnosed with borderline personality disorder, bipolar 2, insomnia, generalized anxiety disorder, social anxiety disorder, post-traumatic stress disorder ("PTSD") and major depression. Her symptoms include having a major fear of abandonment, risky behavior, almost delusional thinking, paranoia, mood swings, fears, being codependent and very impulsive, getting very angry and lying. Mother was familiar with a certain sexually-oriented website, as she had posted pictures of herself on it during manic episodes. Mother is prescribed medication, which she said she is taking.

{¶ 41} Mother also has physical ailments including fainting spells, a knee issue, back pain and a bulging disk. She is waiting on a pain management referral for the bulging disk and will see a cardiologist for the fainting spells.

{¶ 42} Mother said she was approved, in November 2019, for a medical marijuana card in Ohio, for PTSD and chronic back pain. Mother said father was looking into getting a medical marijuana license, and she saw the information so she spoke with her

11.

doctor and was approved. Mother was asked about her prescribed dosage of the marijuana and the frequency that she took it, and she replied "[t]here is no specific dosage * * * I usually will smoke at night and at bedtime. * * * [M]y anxiety causes racing thoughts to not let me fall asleep. * * * [N]ow I'm up to three to four times a day because of how severe my depression has become." Mother stated the marijuana is ingested by edibles, vape oil, cooking it in food. On cross-examination, mother was asked about smoking marijuana, but she said she did not say that she smoked at night; she said she took her medication at night. Mother understood she could not smoke marijuana, she had to vape it. Mother was asked when the last time was that she smoked illegal marijuana and she responded "[i]t definitely has been years."

{¶ 43} Mother admitted she lied numerous times to the caseworkers and CASA. Mother lied about being pregnant with A.T., which caused her stress, and which may have caused A.T.'s lack of development. Mother also lied to caseworker Emily Mauter and the police about father being violent. Mother said domestic violence has not been an issue with father, but she was involved in domestic violence with her son's dad. She acknowledged the police have come out to the house regarding her and father, but mother said she fabricated everything because she was afraid father would take the children and abandon her. In June 2019, mother remembers going to the emergency room complaining about neck, back and arm pain, which she blamed on her boyfriend assaulting her, but she said that was not really the cause. Then, on February 10, 2020,

12.

mother told the police that father struck her in the eye, but she said she also fabricated this.

{¶ 44} When asked if she was visiting the children, mother said she was not feeling well, and her last two visits she had a really bad fever and she did not want to get the children sick. If she is not completely healthy, she tries not to be around the children. Mother stated she did not visit for three months, from November 2019 to February 2020, because losing the children was killing her and she did not want to let them see her falling apart.

{¶ 45} Mother said P.T. has been sick a majority of her life and A.T. has been sick since she has been in LCCS custody. Mother stated she was doing well and then LCCS took A.T. without giving mother any options. Mother opined the children's care in LCCS custody is not appropriate, and the children have had diaper rash, a yeast infection and eczema. When mother tried to raise concerns with the caseworker, mother got backlash from the children's foster mom. Mother said the relationship with the foster mom was awesome at first, but after mother complained about the children's diaper rash going on too long, the relationship has not been the same.

{¶ 46} At the time of trial, mother was living in the YWCA, where she had been for about a month. Mother said she went there to live because Melissa Coburn, the permanency worker for the family, "was trying to convince me to put domestic violence charges on [father] and go to the YWCA with [A.T.] * * * and she was informing me that if I didn't leave, my child would be removed. And I wish I would have took heed to the

13.

warning and left but not at that time." Mother said she left the home on Streicher in August 2019, then stayed with a friend on the couch and was "hopping couches" until she got into the YWCA. Mother had no solid income, as she lost her job due to the fainting spells.

{¶ 47} Mother did not complete the domestic violence classes and she was in limbo with her therapy, as she is in the process of switching mental health providers. Mother was supposed to go to DBT in Perrysburg, but she said it was very difficult because she did not have a vehicle and no buses go out there.

{¶ 48} Mother apologized for the lies she told and the headaches she caused. She understood she could go to jail for falsifying police reports, but said it was not right to let the court believe the lies she told about father. Mother said it would be in the children's best interest to be with father because he is very appropriate and is an amazing father.

**Father**

{¶ 49} Father testified to the following. Before mother was pregnant with P.T., father was testing her to see if she could handle children, because mother told him about what happened with her son, but she said she was a good mom. Mother watched father's sister's kids who were "kind of bad, rough." Father thought if mother "could kind of control a kid raised in the city who mom let them do what they want, like they had no rules, then * * * I will feel much better that you can do it."

{¶ 50} After P.T. was born and removed from the home, LCCS requested that father undergo a dual assessment, attend parenting classes and anger management

classes. Father complied with all of the requests. There was a point where father and mother had unsupervised visits with P.T., which was around the time that A.T. was born. In October and December 2019, father underwent two more assessments. Father and mother were assessed on the same day in October 2019, but went to the facility separately. Father then began therapy in December 2019, and domestic violence classes in March 2020.

{¶ 51} Father thought it was best for his children to live with him. Father lives on East Streicher, but plans to move because the house is sad. Due to the cornavirus, however, he does not have current plans to move, even though he is packed and ready to go.

{¶ 52} Father is not a bad guy, he does not hit. Father knew mother had anxiety and depression, but only found out about the rest of her mental health issues through paperwork. Father and mother moved in together in March 2018, and after a month she started to cry, she was not happy and she was mad. "As time went on I start, like, this ain't the one that I was messing with, like before we moved together." Father tried to tell mother to get help, but she would get mad and break glasses.

{¶ 53} Father discovered that mother was a liar in May 2018, so "[w]e faked a relationship. * * * We told CSB we were together but we wasn't together."

{¶ 54} Father's previous attorney told father if he had his own place, he would have the kids. Father recorded this conversation and mother heard it. Father said he then became the enemy. Mother's "reaction was, oh, you going to try to take the kids and

15.

raise them with another girl and I ain't never going to see them." Mother was a little aggressive and crying. Father and mother stayed together at that time.

{¶ 55} Father last smoked pot in September 2019. Father had been working, but coronavisrus shut the building down and stopped the bus.

{¶ 56} Father was asked how many children he has, and he responded "[o]ne, two – I have four * * * [P.T. and A.T.] [a]nd a 20-year old and one I didn't tell Children Services."

{¶ 57} The last time mother spent the night at father's house was in October 2019, when mother stopped by to get a few items and passed out on the floor. Mother was not supposed to be there, so father put mother in the bedroom and he left and went to see "one of the girls that I talk to."

{¶ 58} Father talked about visits with the children, and said he did not see the children from November 5, 2019 until January 31, 2020, which was 87 days. He explained he was working 12-hour shifts, from 6 p.m. until 6 a.m., and he had to catch the bus at 4:30 p.m., and "the bus would have us at the Erie Street Market about 8:40, 8:45."

### CASA/GAL

{¶ 59} Holly Miller testified to the following. She was appointed as the CASA for P.T., and the GAL for A.T. when she was born.

{¶ 60} Miller conducted an investigation and dependent examination and submitted her findings and recommendation in the GAL report she filed with court.

16.

{¶ 61} Miller visited with the children, met with the caseworkers and the parents' attorneys. She viewed the children's interactions with each other, with the parents and at their foster home. The children are bonded with each other and doing very well. The children are very comfortable in their foster home, and "very confident and trusting of the foster family and very bonded with each other and the other child that's in the home." The interactions between the children and the parents were very appropriate. Miller last saw the parents with the children in August or September 2019, due in part to the parents not visiting with the children. Miller did observe mother behave in an inappropriate manner in the summer of 2018, when mother was upset and trying to point out a red spot on P.T. Miller said the spot did not look red, and mother "was really angry and leaned over and was screaming in my face." Mother had "ongoing concerns with every bump, and scratch and rash on the children, and they've all been addressed." The children had significant diaper rash which was appropriately treated, as they see a dermatologist.

{¶ 62} Miller last spoke with mother in October 2019, because mother did not want contact with Miller, as mother was "out of this case," and not participating in case plan services. Miller saw mother's photographs and soliciting services, including pricing and her location on Streicher, on a website posted February 25, 2020.

{¶ 63} Regarding whether father should be granted custody of the children, Miller was very concerned that he has not engaged in individual therapy and domestic violence batterers' services. She was also very concerned that there are on-going reports of domestic violence and extremely troubled by the lack of visits for so long. She

17.

mentioned Thanksgiving, Christmas, New Years, and a birthday were missed. Miller opined this demonstrates a lack of commitment to the children.

{¶ 64} As to reunification efforts, overnights with P.T. occurred, but then the burn happened and the overnight process stopped. A.T. was born, after the hidden pregnancy, and protective supervision started. There were still allegations of domestic violence, so A.T. was removed. In mid and late September and early October 2019, Miller and Emily Mauter went to the parents' home three times, as they were unable to connect with mother or father. Mother said she did not want to be contacted and father said he was busy working. Up until October 2019, there were still discussions about reunification, but then there was the failure to do case plan services and lack of visitation for three months by both parents. Miller opined there is nothing more that LCCS could have done, and there is nothing more for LCCS to do as the same concerns in the beginning of the case are still the same concerns today, two years later.

{¶ 65} Miller recommended permanent custody to LCCS, as it was in the children's best interest. She based this on so little movement with case plan services, lack of services, lack of commitment, lack of stability and absence of truth. A legally secure, permanent placement was extremely important for the children's growth and development, which cannot be achieved with the parents.

### Permanent Custody Law

{¶ 66} The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence: (1) the existence of

18.

at least one of the four factors set forth in R.C. 2151.414(B)(1)(a) through (d), and (2) the child's best interest is served by granting permanent custody to the agency. *In re M.B.*, 10th Dist. Franklin No. 04AP755, 2005-Ohio-986, ¶ 6; R.C. 2151.353(A)(4). Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 67} A juvenile court's decision in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th Dist. Franklin Nos. 03AP-1167 and 03AP-1231, 2004-Ohio-3312, ¶ 28. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Furthermore, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19, 526 N.E.2d 1350 (1988). Hence, a judgment supported by some competent, credible evidence going to all essential elements of the case is not against the manifest weight of the evidence. *Id.*; *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

19.

**Factors under R.C. 2125.414(B)(1)**

{¶ 68} R.C. 2125.414(B)(1) states in relevant part:

(a) The child is not abandoned * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

**R.C. 2151.414(E)**

{¶ 69} R.C. 2151.414(E) requires a juvenile court to find that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with either parent if any one of sixteen factors are met. R.C. 2151.414(E)(1) - (16). R.C. 2151.414(E)(1), (2) and (4) provide:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing * * *;

\* \* \*

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child; \* \* \*.

**Juvenile Court's Decision**

{¶ 70} The court outlined and thoroughly addressed each of the case plan services offered to mother and father, as well as other concerns and issues which were present in the cases. The court also reviewed the testimony and evidence offered at trial, upon which it relied in reaching its conclusions and findings.

{¶ 71} The court found, inter alia, under R.C. 2151.414(B)(1)(a), that the children: were not abandoned; have not been in the temporary custody of LCCS for twelve or more months; and cannot or should not be placed with either parent within a reasonable time.

{¶ 72} The court further found, under R.C. 2151.414(E)(1), (2), and (4), the following. Under R.C. 2151.414(E)(1), the parents failed to complete the needed services to solve the problems causing the children's removal, and "'non-compliance with a case plan is grounds for termination of parental rights.'" The court further found despite reasonable case planning and diligent efforts by LCCS, the parents failed to substantially remedy the conditions causing the children to be placed outside of the home.

21.

{¶ 73} Under R.C. 2151.414(E)(2), the court found no evidence that mother has resolved or made substantial progress in addressing her mental health issues to a degree that the children would be safe in her care.

{¶ 74} The court found, under R.C. 2151.414(E)(4), the parents demonstrated a lack of commitment to the children by failing to visit from November 2019 until February 2020. Mother failed to visit for 94 days, and father failed to visit for 87 days. The court did not accept the parents' excuses for not visiting the children, and noted "[m]any parents work many hours (indeed many with 12-hour shifts), yet they find time to parent their children on a full-time basis." The court set forth it "has great concerns that father went almost 3 months without seeing his children for the one hour per week he has allotted."

{¶ 75} The court also found the parents failed to complete their case plan services, and instead of addressing their problems, they spent more energy complaining and trying to hide their problems.

{¶ 76} The court observed that LCCS requested an updated diagnostic assessment due to domestic violence concerns, and father completed assessments at Unison in late 2019, both of which included recommendations for clinical therapy. The court found "the Unison documents contain clear evidence of father's refusal to participate in mental health treatment." The court noted "[f]ather's mental health records contain evidence of his childhood trauma and other unresolved mental health issues." The court found "father remains in denial about the problems he must address."

22.

{¶ 77} The court found "domestic violence remains a prevalent concern * * *. If true, both parents failed to address a serious problem. If untrue, mother's disturbing behavior coupled with father tolerating or ignoring her behavior and failing to step up to provide a safe and stable home forecast a bleak future if these children returned to their care."

{¶ 78} The court found mother's trial testimony, that she accused father of domestic violence to cover up her fainting condition, not credible. The court did find "the most compelling and credible evidence of the domestic violence contained in mother's own admissions on page 122 of the St. Charles Mercy Hospital medical records." As "[m]other's June 2019 medical records document the severe degree of the injury she suffered causing her to seek medical attention." In addition, the court observed "the undisputed evidence at trial indicates father has an active charge for domestic violence - and an active warrant - in Toledo Municipal Court. Mother took the effort to have father charged with domestic violence in February 2020."

{¶ 79} The court considered all of the factors under R.C. 2151.414(D)(1)(a) through (e), and found it was in the children's best interest to award permanent custody to LCCS, as the foster caregivers are a prospective adoptive home. The court found the children were well-cared for in the foster home, and all of their needs are met.

{¶ 80} The court further found LCCS made reasonable efforts to avoid the continued removal of the children from the home, and to implement and finalize a permanent plan, by providing case plan services to the parents and the children. The

23.

court specifically found "continuation in the family home of either parent is contrary to the welfare and best interest of the children."

**Father's First Assignment of Error**

{¶ 81} Father contends the trial court erred in finding, by clear and convincing evidence, that LCCS made reasonable efforts to re-unify the children with him. Father maintains he substantially complied with LCCS's case plan, and LCCS did not meet its burden of proving it made reasonable efforts at reunification. Father acknowledged there were concerns regarding visitation for three months, but he had to work 12-hour shifts and take the bus to and from his job. As to father's marijuana use, he observes there was no "testimony that the usage had or would affect his behavior toward his children," so his marijuana use should not disqualify him from being a father to his children.

**Law**

{¶ 82} R.C. 2151.419(A)(1) provides:

> [A]t any hearing * * * at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency * * * has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home.

24.

{¶ 83} The agency has the burden of proving that it made reasonable efforts to reunite the family. *Id.* "In determining whether reasonable efforts were made, the child's health and safety shall be paramount." *Id.*

{¶ 84} In *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 41, the Ohio Supreme Court held that the reasonable efforts requirement, in R.C. 2151.419(A)(1), does not apply in a hearing on a motion for permanent custody.

**Analysis**

{¶ 85} Upon review, the juvenile court was not required to make a reasonable efforts finding under R.C. 2151.419. Nonetheless, the court did find, by clear and convincing evidence, LCCS made reasonable efforts to reunify the family. The evidence shows

{¶ 86} LCCS prepared and presented to father numerous case plans which were reasonably calculated to reunify the family and keep the children safe and healthy. Father initially complied, and completed the services. However, as the cases progressed, the concerns which caused LCCS's original involvement reoccurred and persisted for the remainder of the cases. These concerns included substance abuse, domestic violence and housing. Moreover, father did not visit the children for almost three months, and only resumed visits after the caseworker reached out to him.

{¶ 87} While LCCS continued to try to work with father throughout the cases, father did not restart services until near the time that LCCS filed for permanent custody.

Then, father attended several domestic violence classes and participated in some therapy sessions. This was almost two years after P.T.'s case with LCCS commenced.

{¶ 88} We conclude the trial court's finding, that LCCS had made reasonable efforts to reunite the family, is supported by clear and convincing evidence in the record, although the trial court was not required to make such a finding. Accordingly, father's first assignment of error is not well-taken.

**Father's Second Assignment of Error**

{¶ 89} Father asserts the trial court erred in finding, by clear and convincing evidence, it is in the best interest of the children to terminate his parental rights and award permanent custody of the children to LCCS. Father observes the court cites to R.C. 2151.414(E)(1) and relies on on-going mental health and domestic violence concerns, but he completed anger management and mental health services as recommended. Father claims the court questioned his mental health without providing any explanation or justification as to its significance, and the court cites to R.C. 2151.414(E)(2), but there is no reference to father as it pertains to mental illness or chemical dependency that is so severe that it makes him unable to provide an adequate permanent home for the children.

{¶ 90} Last, father notes the court cites to R.C. 2151.414(E)(4), that the parents demonstrated a lack of commitment by failing to support, visit or communicate with the children when able to do so, but father argues he has explained that he had to work, which made it difficult to appear for the scheduled visits. Father submits the primary

concern of the court in terminating the parental rights was the overall instability of mother which was imputed to him.

## Best Interest Standard

{¶ 91} R.C. 2151.414(D)(1) provides that the trial court shall consider all relevant factors when making custody determinations including: the wishes of the child; the child's interactions and relationships with parents, siblings, and any person who may significantly affect the child; the custodial history of the child; and the child's need for a legally secure, permanent placement.

## Analysis

{¶ 92} Father does not challenge the trial court's R.C. 2151.414(B)(1) finding as it relates to him. Therefore, we will not address it.

{¶ 93} Upon review of the best interest finding, which was challenged by father, the evidence in the record reveals the following. The foster home is the only home P.T. has ever known. A.T. has lived in the same foster home for her entire life, except for the first four months, when she lived with parents under LCCS's protective supervision. P.T. and A.T. are bonded to the foster family, who are interested in adopting the children if LCCS is awarded permanent custody. The children are too young to express their wishes, but the CASA/GAL recommended permanent custody be award to LCCS, so the children can have a legally secure, permanent placement.

{¶ 94} The evidence also shows the children and father have a bond, although father did not visit the children for almost three months. Father resumed visits with the

27.

children only after the caseworker contacted him; he did not take any steps to reestablish contact or maintain a relationship with the children. This shows a lack of commitment. In addition, father did not complete all of the case plan services needed to resolve the problems causing the children's removal, including attending all of the recommended therapy appointments. The trial court specified that "[f]ather's mental health records contain evidence of his childhood trauma and other unresolved mental health issues. * * *. [F]ather remains in denial about the problems he must address."

{¶ 95} The evidence shows that due to domestic violence concerns and/or father's failure to separate himself from mother, who he claims lied about the domestic violence incidents, father could not provide the children with a secure, permanent placement.

{¶ 96} We find the trial court considered all of the relevant best interest factors, and determined the factors weighed in favor of granting permanent custody of the children to LCCS. We further find that clear and convincing evidence supports the court's decision that it is the children's best interest to terminate father's parental rights and award permanent custody to LCCS. Accordingly, father's second assignment of error is found not well-taken.

### Mother's First Assignment of Error

{¶ 97} Mother argues the evidence supporting the trial court's finding that A.T. could not be returned to the parents was not clear and convincing since A.T. had only been removed from the home approximately seven months before the final hearing. Mother notes A.T. was removed from the home in August 2019, and the permanent

28.

custody hearing was in March 2020. Mother contends while she and father did not completely finish their case plan services, they made progress towards completing the services, and no evidence was presented that she would not be able to complete her recommended services within the available time remaining on A.T.'s case.

{¶ 98} Mother submits, pursuant to R.C. 2151.414(B)(1), A.T. had been in LCCS's the temporary custody for approximately eight of twelve months at the time of trial, not twelve of twenty-two consecutive months, although LCCS did have protective supervision of A.T. for four months prior to the temporary custody. Mother argues over one year remained available to the parents to complete their recommended services with regard to A.T., therefore the state did not prove by clear and convincing evidence that mother could not complete her services within the time remaining on the case. Mother further asserts her and father's performance in P.T.'s case is not dispositive of their ability to complete case plan services in A.T.'s case.

## Analysis

{¶ 99} Although the main focus of mother's argument is A.T., we find it necessary to include P.T. in our analysis, given the history of the family's cases with LCCS.

{¶ 100} The record shows the same concerns which caused LCCS's original involvement with the family when P.T. was born, are the same concerns which existed at the time of trial. Both parents have issues with substance abuse, domestic violence, mental health and housing. While mother claims she and father made progress towards completing the case plan services, and there was no evidence she would not be able to

29.

complete her services within the time remaining on A.T.'s case, the evidence reveals that for more than two years, LCCS tried to work with the parents yet mother and father did not resolve the issues which caused the removal of the children. Moreover, the case plan allowed mother and father visitation with the children once a week for an hour, but for approximately three months, both parents did not visit the children. Mother did not make a genuine effort to attend visits and complete services when she had the opportunity. There is no evidence in the record that it would be beneficial to the children to allow mother to have additional time to try to achieve what she already should have accomplished.

{¶ 101} Upon review, we find there is clear and convincing evidence in the record to support the trial court's determination that, pursuant to R.C. 2151.414(B)(1)(a), the children cannot be placed with the parents within a reasonable time, despite reasonable case planning and diligent efforts by LCCS. We further find there is clear and convincing evidence in the record to support the trial court's conclusion that the parents have failed to substantially remedy the conditions which caused the children's removal. Accordingly, mother's first assignment of error is not well-taken.

## Mother's Second Assignment of Error

{¶ 102} Mother argues the court's decision to award permanent custody of A.T. to LCCS was against the manifest weight of the evidence. Mother relies on the reasons set forth in her first assignment of error.

30.

**Law**

{¶ 103} "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co.*, 54 Ohio St.2d at paragraph one of the syllabus, 376 N.E.2d 578.

**Analysis**

{¶ 104} The record shows P.T. has never lived with parents and A.T. lived with parents for four months before she was placed with P.T. in a foster home. Mother and father had issues with substance use and domestic violence, and mother had mental health concerns and consistently lied. Mother and father consistently visited with P.T. and A.T. until November 2019, when both parents stopped visiting for approximately three months. Mother and father completed some, but not all, of the case plan services. Mother did not have independent, stable housing, and father was being evicted from the house he rents. Despite LCCS offering mother and father case plan services over more than a two-year period, the issues which caused the children to be removed from the home still exist.

{¶ 105} Based upon these circumstances, we find the juvenile court's decision to grant permanent custody of the children to LCCS is supported by sufficient competent, credible evidence and is not against the manifest weight of the evidence. Accordingly, mother's second assignment of error is not well-taken.

{¶ 106} For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellant, A.T., and appellant, D.S., are ordered to split the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.


A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.

_____
JUDGE

Arlene Singer, J.

_____
JUDGE

Gene A. Zmuda, P.J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.